**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| SONYA LEANNE MAPLES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:17-CV-423-PRC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner for Operations, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Sonya Leanne

Maples on October 9, 2017, and a Brief in Support of Plaintiff's Complaint to Review Decision of

Commissioner of Social Security Administration [DE 21], filed by Plaintiff on May 9, 2018.

Plaintiff requests that the January 12, 2017 decision of the Administrative Law Judge denying her

claim for supplemental security income be reversed and remanded for further proceedings. On June

14, 2018, the Commissioner filed a response, and Plaintiff filed a reply on June 25, 2018. For the

following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On June 19, 2014, Plaintiff filed an application for supplemental security income, alleging

disability beginning November 26, 2007. The application was denied initially and on

reconsideration. Administrative Law Judge Stephanie Katich ("ALJ") held a hearing. In attendance

at the hearing were Plaintiff, Plaintiff's boyfriend, Plaintiff's attorney, and an impartial vocational

expert. On January 12, 2017, the ALJ issued a written decision denying benefits, making the

following findings:

> 1.    The claimant has not engaged in substantial gainful activity since June 19,
>        2014, the application date.

2.  The claimant has the following severe impairments that cause more than a minimal limitation in the ability to perform basic work activities, therefore they are considered to be severe: degenerative disc disease of the cervical spine (Exhibit 20F/48), myofascial pain syndrome (Exhibit 22F/8), psychogenic nonepileptic seizures (Exhibits 20F/12), COPD (Exhibit 22F/8), Hashimoto's thyroiditis (Exhibit 22F/8), lupus erythematosus (Exhibit 22F/8), chronic kidney disease (Exhibit 22F/13), bipolar disorder (Exhibit 10F/7), PTSD (Exhibit 21F/2), cannabis use disorder (Exhibit 15F/4), schizoaffective disorder (Exhibit 21F/2), rheumatoid arthritis (Exhibit 16F/3), fibromyalgia (Exhibit 22F/8), and ankylosing spondylosis (Exhibit 16F/3).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for the following limitations. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to hazards such as dangerous moving machinery, unprotected heights, and uneven terrain. She should avoid concentrated exposure to fumes, odors, dusts, gases, and other similar respiratory irritants. The claimant can understand, remember, and carry out simple instructions. She can make judgments on simple work related decisions. She can respond appropriately to occasional interactions with co-workers, supervisors, and the general public. She can respond appropriately to usual work situations. She can deal with routine changes in a work setting.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born [in 1969] and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.  The claimant has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 19, 2014, the date the application was filed.

(AR 18-29).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v.*

*Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

# DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not disabled,

and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity (RFC). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

In her appeal, Plaintiff argues that the ALJ made several errors in assessing Plaintiff's residual functional capacity, namely that the ALJ did not properly consider the records of Plaintiff's treating sources, including Dr. Teresa Greiner and the treatment team at Northeastern Center; the ALJ gave improper weight to the opinion of a treating chiropractor; the ALJ did not properly consider Plaintiff's subjective statements; and the ALJ did not account for Plaintiff's moderate limitations in concentration, persistence, and pace.

The residual functional capacity ("RFC") is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

The Court considers each of Plaintiff's arguments in turn.

### A. Assessment of Treating Physician Records

First, Plaintiff argues that the ALJ erred in analyzing the treatment records by drawing her own conclusions from the medical evidence in place of the stated medical conclusions of the treating sources. Indeed, a comparison of the ALJ's discussion of these treatment records with the records themselves shows that the ALJ discussed only those portions of certain records that appear to support the RFC while failing to discuss the records consistent with Plaintiff's allegations of disability. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (finding that the ALJ "was inappropriately selective in choosing the evidence on which she based her opinion" because the ALJ

"identified pieces of evidence in the record that supported her conclusion that Mr. Scrogham was not disabled, but she ignored related evidence that undermined her conclusion"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

1. *Dr. Greiner and the Treatment Team at Northeastern Center*

On May 21, 2014, Plaintiff was seen at Northeastern Center, a counseling center, by the "Treatment Team," which included Dr. Greiner, intake therapist Ms. Andres, director Ms. Jones, and case facilitator Ms. Sikorski, and was diagnosed with bipolar disorder, manic, moderate and post traumatic stress disorder. (AR 671).

On June 16, 2014, Dr. Greiner completed a "Psychiatric Evaluation," which indicated that Plaintiff was being treated for bipolar disorder. (AR 666). Prior to that visit, Plaintiff had not received psychiatric care for the prior six years other than through her primary care. *Id*. Dr. Greiner's "Assessment and Diagnosis" was bipolar disorder depressed; post traumatic stress disorder, cognitive disorder not otherwise specified, probably secondary to medical problems; and rule out borderline personality disorder. (AR 667). Dr. Greiner noted that Plaintiff's stressors were homelessness, poor social support system, abuse as a child and adult, and loss of companion support animal. *Id*. Dr. Greiner assigned a GAF of 50. *Id*. Dr. Greiner recommended proper treatment for Plaintiff's seizure disorder and requested records to determine whether there was some somatization. *Id*. Dr. Greiner recommended neuropsychological testing because Dr. Greiner "question[ed] whether she is competent," specifically as to whether Plaintiff could manage her own funds should she receive disability benefits. *Id*. Dr. Greiner changed Plaintiff's medication from Effexor to Fetzima, and from Ambien to Seroquel. *Id*. Dr. Greiner directed Plaintiff to discuss weaning off Klonopin as

her seizures stabilized. *Id.* Dr. Greiner wrote that Plaintiff "[n]eeds intensive services from Northeastern Center." (AR 668).

On August 19, 2014, Plaintiff was again treated at Northeastern Center by the same Treatment Team. (AR 669). The diagnosis was changed to bipolar disorder, depressed, moderate and post traumatic stress disorder. (AR 669). The treatment note indicated that Plaintiff's GAF increased because she was engaged in services. *Id.* Plaintiff was evaluated by the treatment team at Northeastern Center on November 11, 2014, January 26, 2015, March 5, 2015, April 15, 2015, June 8, 2015, August 27, 2015, November 11, 2015, January 27, 2016, April 4, 2016, June 6, 2016, and received therapy throughout that time period. (AR 894-966).

More recently, on April 4, 2016, the treatment record lists Plaintiff as needing help with mental illness issues, help with depression, help with relationships, help with tension or stress, and help with problem solving. (AR 902). Her diagnoses included post traumatic stress disorder, unspecified somatic symptom and related disorder, and schizoaffective disorder, depressive type, unspecified. (AR 903).

In the most recent treatment record, dated June 6, 2016, Plaintiff's recovery needs were listed as help with mental illness issues, help with depression, help with relationships, help with tension or stress, and help with problem solving. (AR 894). Plaintiff reported recent "severe symptoms of PTSD such as forgetfulness, frequent black outs, loss of time, confusion, and rapid behavior changes." *Id.* Her diagnoses remained the same. (AR 895). The "Review of Goals/Objectives Over Past 90 Days" indicates that Plaintiff had made some progress in her thought disturbances, had not been talking about the government injecting chips in her body, and had been thinking rationally the last few appointments. (AR 896). Regarding her symptoms of depression, the record indicates that

Plaintiff reported she is doing well with her depression and takes her medications to help with depression. *Id*. The record provides that Plaintiff was observed to be in good spirits in all meetings. *Id*. Regarding the goal of decreasing symptoms of traumatic stress, Plaintiff reported that she was doing well and sleeping better, which allowed her to make progress on her traumatic stress. *Id*. Notably, Plaintiff reported that she was doing well in her life other than her medical issues. *Id*. Regarding her physical/medical problems, it was noted that Plaintiff is making progress as she is going to her appointments but "always reports new findings or other issues that lead her to another physician or specialist so nothing is really getting done." (AR 897). As for increasing community connection and involvement, progress was being made as Plaintiff had assistance to help her make her housing payments and had food stamps, and Plaintiff had reached out to a lawyer about her disability case. *Id*. Regarding her social and interpersonal skills, Plaintiff reported improvement and better communication with her fiancé. *Id*. It was noted that Plaintiff used good eye contact and tone of voice during conversation but that she can be very flamboyant and sometimes animated when talking. *Id*.

However, as argued by Plaintiff, despite the treatment notations regarding some progress, the same records show Plaintiff as having achieved less than one quarter of the target goal for each of the functional areas discussed above. (AR 897-900). Under "Alteration in Mood –Depression," Plaintiff's "Current" rating was "10" with a "Target" rating of "100." (AR 897). On the same scale, the Current/Target Rating for "Community Connection" was 14/100, (AR 898), for "Physical Health" was 5/100, (AR 899), for "Psychosis/Thought Disturbances" was 5/100, *id*., for "Social/Interpersonal Deficits" was 20/100, (AR 900), and for "Traumatic Stress" was 22/100, *id*. Although these June 2016 ratings were an improvement over the April 2016 ratings, *see* (AR 905-

908), the ratings do not appear to support a level of functioning necessary to engage in work-related activities on a regular and continuing basis. The ALJ did not discuss these ratings.

Plaintiff argues that the findings in these treatment records should have been the focus of the ALJ's discussion on the combined impairments at issue in this case. Plaintiff contends that, instead of discussing the treating doctor and clinicians' medical assessments based on their treatment of Plaintiff, the ALJ focused on certain facts within the records and comes to different or impermissible conclusions about Plaintiff's impairments. Indeed, it appears that the ALJ's discussion of the Northeastern Center records serves only to discredit Plaintiff without considering the extent to which they support Plaintiff's alleged limitations regarding her mental health. For example, the ALJ noted that Plaintiff "reported that she was unemployed, not looking for work, and was trying to obtain disability." (AR 22). It is unclear how this statement about Plaintiff's situation undermines the severity of her alleged impairments.

The ALJ then commented that there are contradictions in Plaintiff's self reports to the Treatment Team, noting that Plaintiff reported that her ex-boyfriend had physically, emotionally, and sexually abused her, but in a different record stated that they were engaged to be married and getting along well, and then stated that she did not trust him, felt trapped in the relationship, but stayed because of his financial support. *Id*. The ALJ is correct that these reports are in the record, but it is not clear how they are contradictory. It appears from the reports that Plaintiff's circumstances changed; there is no statement by a treating source to suggest that Plaintiff was untruthful about her personal relationships.

The ALJ also noted that the records "consistently indicated that the claimant was making progress, thinking rationally, was in good spirits, was doing well, sleeping better, and had a

significant reduction in symptoms." (AR 22). Importantly, the ALJ did not discuss the "Current/Target" ratings listed above that show that Plaintiff was at less than twenty-five percent of her target recovery, despite treatment for over a year, nor did the ALJ discuss the fact that Plaintiff continued to receive therapy with those ratings. (AR 897-900). The fact that Plaintiff improved over time does not indicate the level of recovery that she achieved.

Next, the ALJ noted the treating comment that Plaintiff "was attending her medical appointments but when she went she 'always reports new findings or other issues that lead her to another physician or specialist so nothing is really getting done.'" (AR 22) (quoting AR 897) (6/6/2016). It is unclear how this report detracts from Plaintiff's allegations regarding her impairments if treating physicians were making new findings and referring her to other physicians. *See* (AR 897). Also, the tone of the treatment record reflects Plaintiff's frustration with the lack of progress regarding her physical health and does not indicate any disbelief of Plaintiff by the author. (AR 897). The ALJ then wrote that it was "further noted that the claimant was unable to produce documentation of her 'many physical and medical problems with new ones arising all the time.'" (AR 22) (citing AR 904) (4/4/2016). First, the second statement quoted by the ALJ was made in a separate treatment note a month earlier than the first quoted statement. *See* (AR 897, 904). Second, the treating source again does not appear to pass judgment on the veracity of Plaintiff's representation regarding her ability to produce physical treatment records; rather, the treatment record provides: "Sonya reports to having many physical and medical problems with new ones arising all the time. [The treater] though has not seen proof of Dr's records so she cannot confirm." (AR 904).

For a second time, the ALJ then commented that Plaintiff's "focus on obtaining disability was noted throughout the records." (AR 22). Again, it is unclear how the intent to obtain disability benefits by someone who allegedly has disabling impairments is a basis for discrediting the severity of the impairments.

The ALJ wrote: "It was also noted that the claimant presented as needing significant help from others for her housing, food, financial, and other basic life needs, *yet* she was able to figure out finding and retaining a lawyer to assist with her disability claim entirely of her own accord." (AR 23) (emphasis added). It again appears that the ALJ juxtaposed two concepts to discredit Plaintiff in a manner not supported by the record itself. The ALJ drew the information from the June 2016 treatment record, under the treatment goal titled "Increase Community Connection/Involvement," which provides: "Sonya is making progress on this goal and objective as she has CANI to help her with her house payments and receives food stamps. She also has reached out to a lawyer on her own for her disability case." (AR 897). Thus, the treatment record understands both sets of actions by Plaintiff as positive steps toward improving her community connection, whereas the ALJ used them to suggest that Plaintiff is gaming the system. The ALJ failed to note that Plaintiff's then-current rating for the goal of "Increase Community Connection/Involvement," which was for Plaintiff to identify and link to community services offered in her area, was only 14 with a target rating of 100. (AR 898).

Next, the ALJ wrote, without analysis, "She was noted to be 'very flamboyant' or 'very dramatic' in her approach to others." (AR 23). It is not clear what meaning the ALJ takes from these clinical observations or how this description of Plaintiff's behavior distracts from her claims of mental impairments, which include diagnoses of bipolar disorder or schizoaffective disorder,

unspecified somatic symptom and related disorder, depression, and post traumatic stress disorder. *See, e.g.*, (AR 895) (6/6/2016), (AR 903) (4/4/2016), (AR 911) (1/27/2016), (AR 919) (11/11/2015), (AR 927) (8/27/2015), (AR 935) (6/8/2015), (AR 943) (4/15/2015), (AR 950) (3/5/2015), (AR 958) (1/26/2015), (AR 963) (11/12/2014).

Next, again without analysis, the ALJ noted that Plaintiff was "diagnosed with rule-out borderline personality disorder." (AR 23) (citing AR 667). It is not clear how this diagnosis constitutes a normal finding or detracts from Plaintiff's reported symptoms. Rather, it suggests that during the initial evaluation of Plaintiff on June 16, 2014, Dr. Greiner considered the possibility that Plaintiff suffered from borderline personality disorder in addition to her bipolar disorder and depression. (AR 666-67).

Then, the ALJ wrote, "It was noted that there was a question regarding whether or not the claimant's seizures were medical or psychological in nature." (AR 23). It is not clear how this detracts from Plaintiff's description of her mental health symptoms. As discussed below, Dr. Hamdi believed that Plaintiff was having psychogenic nonepileptic seizures. (AR 833). Even if the seizures had a psychological component, it appears that Plaintiff still required treatment; no treating source indicated that Plaintiff was faking her seizures. *See Boiles v. Barnhart*, 395 F.3d 421, 422 (7th Cir. 2005) (discussing psychogenic nonepileptic seizures and noting that they "resemble epileptic seizures but are not attributable to epilepsy or abnormal electric activity in the brain"); *Walgren v. Colvin*, No. 12 C 6378, 2013 WL 4659565, at *13 (N.D. Ill. Aug. 29, 2013) (discussing medical literature on psychogenic nonepileptic seizures or "PNES"). It appears that the ALJ interpreted Dr. Hamdi's treatment records as suggesting that Plaintiff's seizures did not really occur. *See* (AR 25).

Next, the ALJ commented, "The notes also indicated that the claimant's alleged symptoms did not necessarily match up with her self-reports of her medical treatment." (AR 23). The ALJ then gave one example: "For example, she reported severe depression and some mania, but stated she was not on any mood stabilizing medication." (AR 23). However, Plaintiff's list of medications over the course of her treatment at Northeastern Center, from November 11, 2014, through June 6, 2016, include Lamictal, a mood stabilizing anticonvulsant medication. (AR 895-963); *see* https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/expert-answers/bipolar-treatment/faq-20058042 (last visited August 23, 2018). Plaintiff was also treated with Lexapro and topiramate. (AR 895, 903, 910-11, 919, 927, 935, 943, 950). The ALJ did not discuss any of these medications.

Then, the ALJ recognized that Plaintiff "was participating in treatment as a requirement of being in transitional housing. She had previously been homeless." (AR 23). From this fact, the ALJ concluded, "The claimant was deemed in need of services to maintain her eligibility for the housing program, which is distinctly different from being found disabled in regards to the ability to work and earn a substantial gainful activity level of income. The claimant expressed motivation to comply with treatment in order to maintain her housing and financial assistance." (AR 23). It is unclear how Plaintiff's receipt of mental health treatment as a condition of maintaining housing assistance means that she does not actually suffer from the mental impairments that her treatment team at Northeastern Center diagnosed and treated for over two years.

Based on the foregoing, the ALJ selected certain statements throughout the Northeastern Center records to conclude that Plaintiff was not believable or was not as limited as she alleges. But in doing so, the ALJ did not discuss those portions of the record that support Plaintiff's allegations

and the ALJ did not discuss the treating doctor's own findings and diagnoses. Nowhere in the ALJ's discussion of the Northeastern Center treatment records did the ALJ discuss Dr. Greiner's June 2014 diagnosis, including her opinion about Plaintiff's inability to handle finances. (AR 667).

The ALJ selectively considered certain treatment records without discussing the record favorable to Plaintiff. Contrary to the Commissioner's argument, Plaintiff is not asking the Court to reweigh the evidence but rather is asking that the ALJ be required to consider the favorable evidence in the first instance and also to properly consider and explain the weight given to the other records. As a result, the ALJ did not build a logical bridge between these treatment records and the RFC. Remand is required for the ALJ to consider all aspects of the Northeastern Center treatment records, including those portions that support Plaintiff's allegations such as the low ratings for achievement of Plaintiff's recovery goals and Dr. Greiner's medical findings.

## 2. *Dr. Hamdi*

Likewise, Plaintiff argues that the ALJ erred by focusing on the possibility that Plaintiff's seizures may have a psychological basis without acknowledging that such seizures nevertheless require treatment. Dr. Hamdi, Plaintiff's treating neurologist, diagnosed Plaintiff with "psychogenic non-epileptic seizures." (AR 833). Plaintiff criticizes the ALJ for interpreting the data from the medical studies performed by Dr. Hamdi to essentially suggest that Plaintiff's seizures were not real when Dr. Hamdi did not offer that opinion. (AR 25). As noted above, even if the seizures had a psychological component, Plaintiff may still have required treatment. *See Boiles*, 395 F.3d at 422; *Walgren*, 2013 WL 4659565, at *13. This is not an instance in which the ALJ weighed a treating physician opinion on functional limitations in light of contrary medical evidence. Rather, the ALJ impermissibly interpreted the underlying data to disbelieve Plaintiff regarding her seizures despite

Dr. Hamdi's diagnosis. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (finding that the ALJ played doctor, "a clear no-no" (citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 90 (7th Cir. 1996))). Moreover, Dr. Hamdi opined that "true epileptic seizures cannot be completely ruled out" and continued Plaintiff on seizure medication. (AR 836). If the ALJ had relied on Dr. Hamdi's medical diagnosis, then the ALJ would have considered the functional limitations that result from the diagnosis. Remand is required for the ALJ to properly consider Dr. Hamdi's diagnosis of psychogenic nonepileptic seizures.

3.    *Fibromyalgia*

Finally, regarding Plaintiff's fibromyalgia, the ALJ wrote, "Regarding the claimant's symptoms of fibromyalgia, while physical examinations showed multiple active tender points, her actual range of motion was only mildly reduced, muscle strength was normal, and there was no evidence of atrophy, fasciculations, or involuntary movements." (AR 22). In support, the ALJ cites generally Exhibit 37F, which, contrary to the ALJ's discussion, does not correlate the severity of Plaintiff's fibromyalgia symptoms with the physical examination findings cited by the ALJ.

Exhibit 37F contains the treatment records from Dr. David Lutz. The exhibit also contains a June 23, 2015 MRI of the brain for right hand numbness with an impression of no acute intracranial abnormality. (AR 1323). The exhibit contains a July 6, 2015 health and physical exam record for treatment for ankylosing spondilitis, fibromyalgia, and lupus with Plaintiff reporting chronic pain and fatigue, describing her pain as sharp, stabbing, and dull and rating her pain as 4, 5, 6, 7, and 8 on a scale of 0 to 10 with 0 representing "no pain" and 10 representing "unbearable." (AR 1316). Plaintiff reported that standing for long periods increases her pain and that sitting, resting, and sleep decrease her pain. *Id*. The exhibit also contains a November 26, 2015 head CT for

a seizure that same day and a history of seizures; the impression was "no acute intracranial abnormality." (AR 1322).

Exhibit 37F contains a December 7, 2015 examination report from Dr. Lutz, in which Plaintiff reported neck pain that ranges from four to eight on a scale of one to ten, with ten being the worst pain. (AR 1310). Plaintiff reported that prolonged standing flares the symptoms and that sitting and rest reduces symptoms. *Id*. Dr. Lutz observed decreased cervical range of motion, which is consistent with Plaintiff's complaints of neck pain, both of which the ALJ failed to note. Dr. Lutz noted active tender points in the cervical paraspinals and upper trapezius ridges. *Id*. And then, Dr. Lutz made the examination findings of mildly reduced range of motion, normal muscle strength, and no evidence of atrophy, fasciculations, or involuntary movements that were listed by the ALJ. *Id*. Nowhere did Dr. Lutz opine that those findings are inconsistent with his diagnosis of fibromyalgia. Under "Recommendations," Dr. Lutz prescribed a comprehensive spine rehabilitation program that included physical therapy with a notation regarding Plaintiff's ankylosing spondylitis diagnosis as well as trigger point injections. (AR 1311). Dr. Lutz then wrote that further testing and treatment for her problem or other future musculoskeletal/pain/neurological problems may include radiological imaging, electromyography, bloodwork, etc. and that future treatments may include medication management, steroid injections, spine intervention procedures, and rehabilitation. *Id*.

On December 18, 2015, Plaintiff received trigger point injections from Dr. Lutz, who encouraged Plaintiff to follow up with physical therapy. (AR 1306). On June 23, 2016, Dr. Lutz authored another report, indicating that Plaintiff had returned for follow up, last having seen him in December 2015. (AR 1300). Plaintiff reported to Dr. Lutz that she had some improvement with trigger point injections and with the rehabilitation program, with partial improvement of *twenty-five percent*. *Id*. Dr. Lutz noted "active trigger points in bilateral cervical paraspinals and bilateral upper

trapezius ridges." *Id*. Dr. Lutz's impressions were cervicalgia, fibromyalgia, myalgia, myositis, history of lupus, "history of ankylosing spondylitis, followed by Rheumatology." *Id*. Dr. Lutz's impression was that Plaintiff would continue to work with physical therapy and that he would offer her another set of trigger point injections, which he believed were medically indicated. *Id*.

Thus, it appears that the ALJ came to a medical conclusion about the severity of Plaintiff's fibromyalgia by referencing certain physical examination findings by Dr. Lutz. Yet, Dr. Lutz did not indicate that the two were related. And, despite the December 2015 examination findings, Dr. Lutz nevertheless administered trigger point injections and recommended physical therapy and then in June 2016 found that another round of trigger point injections was medically indicated. The ALJ's analysis of Plaintiff's fibromyalgia related pain is not supported by substantial evidence.

4.    *Treating Chiropractor*

Regarding Plaintiff's physical impairments, Plaintiff argues that the ALJ erred by emphasizing the opinion of her treating chiropractor. Plaintiff is correct that in two places in the decision, the ALJ quoted chiropractor Dr. Nathaniel Gasdorf's statement: "This patient is trying to get disability benefits when she has all the capacity in the world to work. There is NO REASON she cannot work. NONE. So it is my opinion that Miss Sonya L. Maples has no restrictions and can work just like everyone else." (AR 24, 26, 27) (quoting Ex. 14F/1-8). And, the ALJ referenced Dr. Gasdorf's statement a third time in assessing Plaintiff's credibility. (AR 27). Plaintiff argues that the ALJ gave undue weight to this opinion, even though a chiropractor is not an "acceptable medical source." SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). Plaintiff fails to acknowledge that the ALJ cited SSR 06-03p, recognizing that Dr. Gasdorf was not an acceptable source for establishing Plaintiff's medically determinable impairments but that a chiropractor's opinions may nevertheless be used to establish the severity of a claimant's symptoms. (AR 26). Plaintiff also fails to

acknowledge the ALJ's discussion of the treatment records, specifically that Dr. Gasdorf treated Plaintiff for a short period of time during which he observed Plaintiff not complying with treatment, skipping appointments, and complaining that she was not feeling better when she missed appointments but reporting reduction in symptoms after attending a treatment session and that Dr. Gasdorf found that Plaintiff's allegations were not supported by the medical findings, including x-rays. (AR 24, 26-27). The ALJ gave this opinion significant weight.

It was not improper for the ALJ to rely on Dr. Gasdorf's opinion and treatment records in determining the severity of Plaintiff's symptoms. Nevertheless, it appears that the ALJ gave special significance to Dr. Gasdorf's opinion that Plaintiff can work, given the quotation two times of Dr. Gasdorf's strong opinion. It is not the Court's place to reweigh the evidence; however, on remand, it is suggested that the ALJ consider the nature of Dr. Gasdorf's statements and their importance in light of all the evidence.

### B. Subjective Symptoms

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 416.1529(a); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;

(7)    Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at *3. The "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2.

The Court has already discussed some aspects of the ALJ's assessment of Plaintiff's credibility in relation to her mental impairments. Plaintiff argues that the ALJ also erred in assessing Plaintiff's "noncompliance" in relation to her physical impairments. (AR 24). The ALJ noted that Plaintiff continued to smoke despite having COPD and against medical advice, was noncompliant because she did not take some medications prescribed to alleviate her symptoms, including reducing or discontinuing her medications without consulting or informing her doctor, and did not follow diet, exercise, or other at-home self-care recommendations. *Id.* Plaintiff argues that these assertions of noncompliance are misplaced given that her main impairment is psychological. On remand, the ALJ is directed to consider whether there is a psychological component to Plaintiff's purported noncompliance regarding care for her physical ailments.

### C. Moderate Limitations in Concentration, Persistence, and Pace

Plaintiff argues that both the RFC and the hypothetical posed by the ALJ to the vocational expert failed to account for Plaintiff's moderate limitations in concentration, persistence, and pace. *See Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014). At step three of sequential analysis, the ALJ found that Plaintiff had moderate limitations in concentration, persistence, and pace, citing Plaintiff's "difficulty focusing and persisting with some tasks to completion." (AR 19). In the RFC, the ALJ limited Plaintiff to simple instructions/decisions and to routine changes in the work setting. (AR 20). Plaintiff argues that these limitations do not account for the "ups and downs" of her bipolar

disorder and other psychological disorders. Although the ALJ discussed the medical records at length, the ALJ did not offer any analysis of how she determined that Plaintiff's "difficulty focusing and persisting with some tasks to completion" is addressed by the limitation to simple instructions and routine changes in the work setting.

In *O'Connor-Spinner*, the Seventh Circuit Court of Appeals held that terms like "'simple, repetitive tasks' *on their own* will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." 627 F.3d at 620 (emphasis added). This is because the ability to learn how to do a task of a certain complexity is not the same as the ability to do the given task over a sustained period of time. *Id*. at 620. Although no "specific terminology" is required, the hypothetical question posed to the vocational expert must account in substance for the specific limitations of the claimant. *Id.* at 619 (noting that courts have upheld a hypothetical when "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform"); *see also Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); *Yurt*, 758 F.3d at 856, 858-59; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008). In this case, it is not clear how Plaintiff's moderate limitations in concentration, persistence, or pace are sufficiently addressed in the RFC and the hypothetical. On remand, the ALJ is directed to provide this explanation in the residual functional capacity discussion.

Finally, the Court notes that, in this section of the brief, Plaintiff appears to argue that the ALJ did not consider her impairments in combination, stating in the title of the section that the "ALJ erred in not incorporating limitations from all the medically determinable impairments, both severe and non-severe" and by citing SSR 96-8p for the requirement that the ALJ must consider limitations and restrictions imposed by all of an individual's impairments. (AR 13-14). However, Plaintiff's

argument in this section addresses only her mental impairments and the incorporation of moderate limitations in concentration, persistence, and pace in the RFC. In this context, Plaintiff has not identified any other limitations that the ALJ failed to consider.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Brief in Support of Plaintiff's Complaint to Review Decision of Commissioner of Social Security Administration [DE 21], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 23rd day of August, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT